Robert P. Goe – State Bar No. 137019
SubChapter V Trustee
18101 Von Karman Avenue, Suite 1200
Irvine, CA 92612
bktrsutee@goeforlaw.com

Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA, EDIT DIVISION**

| | |
|---|---|
| In re:<br><br>**BESTHOST INN, LLC,**<br><br>               Debtor. | Case No. **8:21-bk-12158-ES**<br><br>Chapter 11<br>Subchapter V<br><br>**RESPONSE OF ROBERT P. GOE, THE SUBCHAPTER V TRUSTEE IN SUPPORT OF HIS MOTION FOR AN ORDER TO SHOW CAUSE WHY BESTHOST INN LLC AND ITS MANAGING MEMBER MICHAEL REAZUDDIN SHOULD NOT BE HELD IN CONTEMPT FOR FAILURE TO OBEY AN ORDER OF THE COURT**<br><br>Hearing<br>Date:          January 20, 2022<br>Time:         10:30 a.m.<br>Courtroom: 5A **(Via Zoom Videoconference)**<br>ZoomGov:<br>https://cacb.zoomgov.com/j/1619456442<br>Meeting ID: 161 945 6442<br>Password: 148283 |

      Robert P. Goe the SubChapter V Trustee (the "Trustee") hereby files his Response ("Response") in Support of his Motion for an Order to Show Cause re. Contempt [Docket No. 139] filed on December 28, 2021, ("Motion") and to Debtor Besthost Inn, LLC's ("Debtor") Opposition [Docket No. 170], as follows:

      Trustee needs only to make a few points that compel the granting of the Motion.

      1)      The Court's OSC entered December 28, 2021, [Docket No. 158] was also directed

at Michel Reazuddin ("Mr. Reazuddin"), who has not personally submitted any evidence in opposition to the Motion, which should therefore be granted by default as to him;

2)      Contrary to the Opposition, neither Debtor nor Mr. Reazuddin has ever offered to pay a penny of the $25,000 ordered to be paid and if such offer had been made for a payment plan the Trustee would have been all ears;

3)      Debtor has continued to operate its valuable hotel and generate income. In its second filing (8:22-10014-ES) a cash collateral motion was filed [Docket No. 6] attached hereto as **Exhibit 1**, which attaches projections showing income ranging from $140,000 to $156,00 for the next six (6) months with monthly net income ranging from $20,000 to $45,000; and

4)      Mr. Reazuddin was personally able to pay $10,000 to Debtor's new counsel.

In sum, Debtor's hotel business generates approximately $2 million in annual revenue and could easily have paid the $25,000 ordered, but willfully chose to defy the Court's Order.  Further, Mr. Reazuddin has provided no response to the Motion that he does not personally have the funds, and, in fact, the evidence shows he was able to personally pay Debtor's new counsel $10,000.

The Motion should be granted.

Respectfully submitted,

Dated: January 13, 2022

By:  /s/Robert P. Goe
                Subchapter V Trustee

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

# EXHIBIT 1

EXHIBIT 1

NICHOLAS GEBELT (SBN 217362)
15150 Hornell Street
Whittier, CA 90604
Tel.:    562.777.9159
Fax:    562.946.1365
Email:    ngebelt@goodbye2debt.com

Attorney for Besthost Inn, LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| In re: | Bk. No. 8:22-10014-ES |
|---|---|
| BESTHOST INN, LLC, | Chapter 11 |
| Debtor | **NOTICE OF MOTION AND DEBTOR' S EMERGENCY MOTION FOR ORDER AUTHORIZING INTERIM USE OF CASH COLLATERAL PURSUANT TO FRBP 4001(b), LBR 2081-1(a)(9), AND LBR 9075-1;** |
| | **DECLARATIONS OF MICHAEL REAZUDDIN AND NICHOLAS GEBELT IN SUPPORT THEREOF** |

| Date: | To be set by the Court |
|---|---|
| Time: | To be set by the Court |
| Courtroom: | 5A |
| Place: | 411 West Fourth Street |
| | Santa Ana, CA 92701-4593 |

Please see Judge Smith's site at:
https://www.cacb.uscourts.gov/judges/honorable-erithe-smith for instructions on appearing telephonically or via zoom.gov.

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE; THE UNITED STATES TRUSTEE; THE SUBCHAPTER V TRUSTEE; THE SECURED CREDITOR, THE EMPLOYMENT  DEVELOPMENT  DEPARTMENT ("EDD"); SECURED CREDITOR, MR. ROBERT P. GOE ("MR. GOE"); THE TWENTY LARGEST UNSECURED CREDITORS, AND ALL PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE THAT:** Pursuant to Fed. R. Bankr. P. 4001(b),  LBR 2081-1(a)(9), and LBR 9075-1, Debtor and Debtor in Possession, Besthost Inn, LLC ("Besthost"), hereby submits this motion (the "Motion") for an order authorizing it to use the cash collateral of its secured creditors, the EDD and Mr. Goe.

Besthost is concurrently submitting its application for a hearing on shortened notice.

**PLEASE TAKE FURTHER NOTICE THAT:**  Pursuant to Local Bankruptcy Rule 9013-1(f), if you wish to object to this Motion, you must file a written opposition, in the form required by Local Bankruptcy Rule 9013-1(f)(1), no later than 14 days prior to the date of the hearing on this Motion, or no later than the deadline stated by the Court if it grants the concurrently filed application for a hearing on shortened notice.  You must file the opposition with the Clerk of the United States Bankruptcy Court located at 411 West Fourth Street, Santa Ana, CA 92701-4593.  You must serve the opposition on Besthost and Besthost's counsel at the address indicated in the upper left corner of the first page of this notice.  The failure to file an opposition to this Motion may be deemed by the Court as your consent to the relief requested.  If you do not oppose this Motion, you do not need take any action.

The Motion is based on the Statement of Facts given below, the attached Memorandum of Points And Authorities, and on such other argument as may be made by counsel at the time of the hearing.

## I.    STATEMENT OF RELEVANT FACTS

### A.  History Prior To Besthost's Prior Bankruptcy

1.      On February 28, 2013, Mr. Michael Reazuddin ("Mr. Reazuddin"), Besthost's manager, and Creditor, Mr. Cuong Nguyen ("Cuong," aka Cody Nguyen), entered an operating agreement (the "Agreement") to govern Besthost's operations.  Per the Agreement, each was a fifty percent member of Besthost.  A true and correct copy of the Agreement is attached as Exhibit A.

2.      At no time did anyone amend or otherwise change the terms of the Agreement.

3.      Besthost runs a hotel at 8530 Beach Boulevard, Buena Park, CA  90620 (the

2

"Property").  Besthost leases the Property from Pannam Corp. — a company solely owned by Mr.
Loc Nguyen ("Loc"), Cuong's father — with an option to purchase the Property at any time up to
May 31, 2025.

4.      Section 3.01(c) of the Agreement defines a defaulting member:  "Should any
Member fail or refuse for any reason whatsoever to contribute in cash the additional capital
amount which he is required to contribute within 10 days after the due date for payment of such
amount … such Member … shall be deemed to be a 'Defaulting Member' …"

5.      The money Cuong contributed to Besthost's operations came from Loc.  However,
in September 2018 Loc stopped funding Cuong, so on September 11, 2018, Cuong sent an email
to Mr. Reazuddin, stating that he could no longer contribute money to Besthost's operations.

6.      Cuong never contributed anything to Besthost after September 2018.  Thus, per
Section 3.01(c) of the Agreement, since September 2018 Cuong has been a defaulting member.

7.      When Cuong stopped contributing funds to make the lease payments, Besthost
missed lease payments, so in November 2018 Loc filed an unlawful detainer action to evict
Besthost.

8.      Mr. Reazuddin raised the funds without any contribution from Cuong, and paid the
arrearage on the lease, so the 2018 unlawful detainer action was resolved through stipulation.

9.      The last sentence of Section 2.01(d) of the Agreement states:  "In no event shall a
Member who is in default under this Agreement at the time a vote is taken or decision is made be
entitled to participate therein, and such Member shall not be eligible to vote."

10.     Therefore, since Cuong is a defaulting member, he is ineligible to participate or
vote in any affairs of Besthost.

11.     Beginning in early 2020, the COVID-19 pandemic catastrophically impacted the
hospitality industry.  As a consequence, Besthost incurred significant debts as it struggled to
continue its operations.  It also missed lease payments.  Therefore, in January 2020 Loc filed
another unlawful detainer action against Besthost.

12.     When the debts became too large to service as they came due, and the pending

3

MOTION FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL

SDG-11-26-21-01-NWG

1    unlawful detainer action threatened to end Besthost as a going concern, bankruptcy was necessary

2    to preserve the business.

3         13.     Therefore, on August 13, 2021, Besthost sent a letter to Cuong stating its intention

4    to seek bankruptcy protection unless Cuong provided some assistance.

5         14.     The first sentence of Section 2.01(d) of the Agreement provides (emphasis added):

6    > The phrase "approved by the Members" as used in this Agreement
7    > means a decision or action approved by those **_Members not in default_**
     > under this Agreement at the time the vote is taken or decision is made
8    > who own 100% of all the "Distribution Percentage Interests" (as defined
     > in Section 3.01 hereof) owned **_by Members not in default_** under this
9    > Agreement at the time the vote is taken or decision is made.

10        15.     When no assistance was forthcoming from Cuong, all the members who were not

11   in default — *i.e.*, Mr. Reazuddin — voted to file a bankruptcy petition.  Accordingly, by the terms

12   of the Agreement, the decision to file for bankruptcy protection was approved by the members.

13   **B.  The Prior Bankruptcy Case**

14        16.     The bankruptcy filing triggered the automatic stay of 11 U.S.C. § 362(a), thus

15   staying the pending unlawful detainer action against Besthost.

16        17.     Therefore, Cuong filed a motion for relief from the automatic stay, and a motion to

17   dismiss the bankruptcy case, based, in part, on challenging Mr. Reazuddin's authority to file

18   Besthost's petition.

19        18.     In its opposition to the motion to dismiss, Besthost's counsel at the time neglected

20   to make the argument that Cuong was a defaulting member, and instead argued that Cuong was a

21   withdrawing member who was therefore ineligible to vote

22        19.     Therefore, since the Agreement did not prohibit withdrawing members from voting

23   — it only prohibited defaulting members from voting — the Court granted the motion to dismiss,

24   without prejudice, solely on the basis that Mr. Reazuddin lacked authority under the Operating

25   Agreement to file the bankruptcy case.

26

27

28

MOTION FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL

SDG-11-26-21-01-NWG

1    **C.    Secured Creditors**

2         **EDD**

3         20.    In the prior case, EDD filed a proof of claim (Claim 4-1) in which it stated, in item

4    9 of page 2, that its claim for $22,683.22 was unsecured[1].  However, a search of the California

5    Secretary of State's website (*see* https://bizfileonline.sos.ca.gov/search/ucc) revealed that EDD

6    recorded six tax liens against Besthost on various dates in 2019 and 2020.  A true and correct

7    printout from the Secretary of State's website showing all the liens recorded against Besthost is

8    attached as Exhibit B.

9         **Mr. Goe**

10        21.    Mr. Goe served as the Subchapter V Trustee in the prior case.  In that capacity he

11   earned fees and incurred costs.  Therefore, he submitted a fee application for $25,000, which the

12   Court granted.  On December 30, 2021, Mr. Goe recorded a judgment lien against Besthost.  Mr.

13   Goe's lien appears on the printout in Exhibit B.

14        **Besthost's Assets**

15        22.    In Schedule A/B of Besthost's petition in the current case, Besthost disclosed assets

16   worth $881,804.  However, two of those assets arising from pending lawsuits between Besthost

17   and Loc and between Besthost and Cuong are unliquidated.  When their estimated values are

18   subtracted from $881,804, the result is $131,804.

19        23.    Since the sum of EDD's and Mr. Goe's claims is $47,683.22 (= $22,683.22 +

20   $25,000.00), the claims of these creditors are fully protected.

21   **II.    MEMORANDUM OF POINTS AND AUTHORITIES**

22        **A.    Legal Authority For Authority To Use Cash Collateral**

23        Fed. R. Bankr. P. 4001(b) permits Besthost to move the Court for authority to use cash

24   collateral.  LBR 2081-1(a)(9) and LBR 9075-1 permit Besthost to submit its cash collateral

25

26   _____

27   [1] For this reason that Besthost listed its $22,683.22 debt to EDD in Schedule E/F of its petition in
     the current case, rather than in Schedule D.

28                                          5

---

MOTION FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL

SDG-11-26-21-01-NWG

1  motion on an emergency basis.  Pursuant to 11 U.S.C. § 363(c)(2), the Court may authorize

2  Besthost to use EDD' and Mr. Goe's cash collateral.

3      **B. The Adequate Protection Requirement**

4      According to 11 U.S.C. § 363(e), Besthost must establish that the interest of its creditors

5  who hold liens on the subject collateral will remain adequately protected.  Besthost can establish

6  adequate protection by showing that the value of the collateral exceeds the amount of EDD's and

7  Mr. Goe's claims, and will not decline in value under Besthost's proposed usage of cash

8  collateral.  *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365

9  (1988).  *See also In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) ("Since the value of the

10  collateral has not declined, the Bank is not … entitled to receive adequate protection."); *In re*

11  *Century Inv. Fund VII, Ltd. Partnership*, 96 B.R. 884, 887 (Bankr. E.D. Wis. 1989) (Where value

12  appears to be stable, creditor is not entitled to adequate protection payments); *In re Anderson*, 88

13  B.R. 877, 889 (Bankr. N.D. Ind. 1988) (Secured creditor is required to show a necessity for

14  adequate protection by showing a decline in asset value from the petition date.).

15      Alternatively, Besthost can make an adequate protection showing even where the

16  collateral is declining in value, as long as EDD's and Mr. Goe's interests are protected by a

17  reasonable equity cushion.  *See, e.g.*, *In re Mellor*, 734 F. 2d 1396 (9th Cir. 1984) (Equity cushion

18  of 20% is sufficient to serve as adequate protection.).

19      Since the liquidation value of Besthost's assets ($131,804)  is more than twice the sum of

20  EDD's and Mr. Goe's claims ($47,683.22), these creditors are more than adequately protected by

21  an equity cushion.  Moreover, there is no reason to believe that these assets are declining in value.

22      **C.  EDD'S And Mr. Goe's Interests Are Adequately Protected By Besthost's**

23          **Continued Operation**

24      A debtor may use cash collateral where such use would enhance or preserve the value of

25  the collateral.  *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (Cash collateral usage

26  allowed where such use is essential "in order to meet operational costs," and where the "secured

27  position can only be enhanced by the continued operation. . . . ").

28

MOTION FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL

SDG-11-26-21-01-NWG

EDD and Mr. Goe are the only secured creditors that have a security interest in Besthost's assets of the Debtor.  Their interests are safeguarded by Besthost's continued operations. Therefore, Besthost is not, at present, offering them any monthly adequate protection payments because their interests are adequately protected by Besthost's continued operation.

Besthost will pay EDD's tax liens in full, at the applicable interest rate, within five years of the petition date.

Mr. Goe's claim appears to have the highest priority of any of Besthost's creditors. Therefore, to avoid any priority-violating distribution, Besthost will pay Mr. Goe in full on the effective date of the plan. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017).

### D.  Besthost's Need To Use The Cash Collateral

To continue its operations and effectively reorganize, Besthost must be able to use the cash collateral of EDD and Mr. Goe to pay the reasonable expenses it incurs in the ordinary course of its business.  These expenses include payroll, payroll taxes, insurance, utilities, rent, and other necessary business expenses listed in its cash collateral budget (the "Budget") attached as Exhibit C.

If the Court permits Besthost to use the cash collateral, Besthost will continue doing business, thus preserving its assets for the benefit of the estate and the creditors, including EDD and Mr. Goe.

However, if Besthost's access to the cash collateral is interrupted, the consequences would be disastrous for the creditors because Besthost would be unable to operate its business.  The employees and the customers would leave, the business would shut down, and its value would drop to zero.

In sum, it is in the best interest of the estate and its creditors for the Court to authorize Besthost to use the cash collateral to continue operating the hotel.

### E.  Besthost's Need For Budget Flexibility

Although the Budget is Besthost's best estimate of its necessary expenses, its needs may fluctuate.  Therefore, it asks the Court for authority to deviate from the total expenses in the

7

Budget by no more than 15%, and to deviate by category — provided Besthost does not pay any expenses outside any of the approved categories — without the need for further Court order or the express written consent of EDD and Mr. Goe in advance.  However, if an emergency arises that requires greater than 15% deviation, Besthost will notify EDD and Mr. Goe of the expenditures immediately.

### F.  The Court Should Promote Reorganization

In determining adequate protection, Courts have stressed the importance of promoting a Debtor's reorganization.  For example, the Tenth Circuit held:

> Debtors … have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization.  This quest is the ultimate goal of Chapter 11. Hence, the Debtors' efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.

*In re O'Connor*, 808 F. 2d 1393, 1397-98 (10th Cir. 1987).

Therefore, in order to promote Besthost's reorganization, the Court should grant the relief requested in this Motion.  Besthost has demonstrated that the use of the cash collateral will preserve its assets and operations, which will inure to the benefit of the estate and the creditors, including the EDD and Mr. Goe.  Indeed, a successful reorganization depends upon the use of cash collateral.

## III.    RELIEF REQUESTED:

Based on the above discussion, Besthost respectfully asks the Court to enter an order authorizing Besthost to use the cash collateral on the terms and conditions described in this Motion, and grant such other and further relief as is just  and proper under the circumstances.

MOTION FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL

SDG-11-26-21-01-NWG

DATED: January 6, 2022.

Respectfully submitted,

LAW OFFICES OF NICHOLAS GEBELT

By: _____

Nicholas Gebelt
Attorney for BESTHOST INN, LLC

9

MOTION FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL

SDG-11-26-21-01-NWG

## DECLARATION OF MICHAEL REAZUDDIN

I, Michael Reazuddin, declare and state as follows:

1.      I am the Managing Member of Besthost Inn, LLC ("Besthost"), the Debtor and Debtor-in-Possession.  I am over the age of 18.  I have personal knowledge of the facts stated below, and if I were to be called as a witness, I could and would competently testify about the content of this declaration.

2.      I have read the motion to which this declaration is attached, and declare under penalty of perjury that its content is true and correct.

3.      On February 28, 2013, Mr. Cuong Nguyen ("Cuong") and I entered an operating agreement (the "Agreement") to govern Besthost's operations.  Per the Agreement, each of us was a fifty percent member of Besthost.  A true and correct copy of the Agreement is attached as Exhibit A.

4.      At no time did anyone amend or otherwise change the terms of the Agreement.

5.      Besthost runs a hotel at 8530 Beach Boulevard, Buena Park, CA  90620 (the "Property").  Besthost leases the Property from Pannam Corp. — a company solely owned by Mr. Loc Nguyen ("Loc"), Cuong's father — with an option to purchase the Property at any time up to May 31, 2025.

6.      Section 3.01(c) of the Agreement defines a defaulting member:  "Should any Member fail or refuse for any reason whatsoever to contribute in cash the additional capital amount which he is required to contribute within 10 days after the due date for payment of such amount … such Member … shall be deemed to be a 'Defaulting Member' …"

7.      The money Cuong contributed to Besthost's operations came from Loc. However, in September 2018 Loc stopped funding Cuong, so on September 11, 2018, Cuong sent an email to me stating that he could no longer contribute money to Besthost's operations.

8.      Cuong never contributed anything to Besthost after September 2018.  Thus, per Section 3.01(c) of the Agreement, since September 2018 Cuong has been a defaulting member.

MOTION FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL

SDG-11-26-21-01-NWG

9. When Cuong stopped contributing funds to make the lease payments, Besthost missed lease payments, so in November 2018 Loc filed an unlawful detainer action to evict Besthost.

10. I raised the funds without any contribution from Cuong, and paid the arrearage on the lease, so the 2018 unlawful detainer action was resolved through stipulation.

11. The last sentence of Section 2.01(d) of the Agreement states: "In no event shall a Member who is in default under this Agreement at the time a vote is taken or decision is made be entitled to participate therein, and such Member shall not be eligible to vote."

12. Therefore, since Cuong is a defaulting member, he is ineligible to participate or vote in any affairs of Besthost.

13. Beginning in early 2020, the COVID-19 pandemic catastrophically impacted the hospitality industry. As a consequence, Besthost incurred significant debts as it struggled to continue its operations. It also missed lease payments. Therefore, in January 2020 Loc filed another unlawful detainer action against Besthost.

14. When the debts became too large to service as they came due, and the pending unlawful detainer action threatened to end Besthost as a going concern, bankruptcy was necessary to preserve the business.

15. Therefore, on August 13, 2021, Besthost sent a letter to Cuong stating its intention to seek bankruptcy protection unless Cuong provided some assistance.

16. The first sentence of Section 2.01(d) of the Agreement provides: "The phrase 'approved by the Members' as used in this Agreement means a decision or action approved by those Members not in default under this Agreement at the time the vote is taken or decision is made who own 100% of all the 'Distribution Percentage Interests' (as defined in Section 3.01 hereof) owned by Members not in default under this Agreement at the time the vote is taken or decision is made."

17. When no assistance was forthcoming from Cuong, all the members who were not in default — i.e., I — voted to file a bankruptcy petition. Accordingly, by the terms of the

11

SDG-11-26-21-01-NWG

1  Agreement, the decision to file for bankruptcy protection was approved by the members.

2      18.    The bankruptcy filing triggered the automatic stay of 11 U.S.C. § 362(a), thus

3  staying the pending unlawful detainer action against Besthost.

4      19.    Therefore, Cuong filed a motion for relief from the automatic stay, and a motion

5  to dismiss the bankruptcy case, based, in part, on challenging my authority to file Besthost's

6  petition.

7      20.    In its opposition to the motion to dismiss, Besthost's counsel at the time neglected

8  to make the argument that Cuong was a defaulting member, and instead argued that Cuong was a

9  withdrawing member who was therefore ineligible to vote.

10     21.    Therefore, since the Agreement did not prohibit withdrawing members from

11  voting — it only prohibited defaulting members from voting — the Court granted the motion to

12  dismiss, without prejudice, solely on the basis that I lacked authority under the Operating

13  Agreement to file the bankruptcy case.

14     22.    In the prior case, EDD filed a proof of claim (Claim 4-1) in which it stated, in

15  item 9 of page 2, that its claim for $22,683.22 was unsecured[2].  However, a search of the

16  California Secretary of State's website (*see* https://bizfileonline.sos.ca.gov/search/ucc) revealed

17  that EDD recorded six tax liens against Besthost on various dates in 2019 and 2020.  A true and

18  correct printout from the Secretary of State's website showing all the liens recorded against

19  Besthost is attached as Exhibit B.

20     23.    Mr. Goe served as the Subchapter V Trustee in the prior case.  In that capacity he

21  earned fees and incurred costs.  Therefore, he submitted a fee application for $25,000, which the

22  Court granted.  On December 30, 2021, Mr. Goe recorded a judgment lien against Besthost.  Mr.

23  Goe's lien appears on the printout in Exhibit B.

24     24.    In Schedule A/B of Besthost's petition in the current case, Besthost disclosed

25  assets worth $881,804.  However, two of those assets arising from pending lawsuits between

26  _____

27  [2] For this reason that Besthost listed its $22,683.22 debt to EDD in Schedule E/F of its petition in
   the current case, rather than in Schedule D.

28                                           12

1  Besthost and Loc and between Besthost and Cuong are unliquidated. When their estimated

2  values are subtracted from $881,804, the result is $131,804.

3      25.    Since the sum of EDD's and Mr. Goe's claims is $47,683.22 (= $22,683.22 +

4  $25,000.00), the claims of these creditors are fully protected.

5      26.    To continue its operations and effectively reorganize, Besthost must be able to use

6  the cash collateral of EDD and Mr. Goe to pay the reasonable expenses it incurs in the ordinary

7  course of its business. These expenses include payroll, payroll taxes, insurance, utilities, rent,

8  and other necessary business expenses listed in its cash collateral budget (the "Budget") attached

9  as Exhibit C. I personally prepared the Budget.

10

11      Executed on January 6, 2022, at Buena Park, California.

12      I declare under penalty of perjury under the laws of the United States of America and the

13  State of California that the foregoing is true and correct.

14

15  _____
    Michael Reazuddin

16

17

18

19

20

21

22

23

24

25

26

27

28  <center>13</center>

<center>MOTION FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL</center>

SDG-11-26-21-01-NWG

## DECLARATION OF NICHOLAS GEBELT

I, Nicholas Gebelt, declare as follows:

1.      I am an attorney licensed to practice in the State of California.  The contents of this declaration are based upon my own personal knowledge .  If called upon to testify, I could and would testify to the following.

2.      I represent Chapter 11 Debtor, Besthost Inn, LLC ("Besthost"), in this case.

3.      On January 5, 2022, I personally searched the California Secretary of State's website (*see* https://bizfileonline.sos.ca.gov/search/ucc) and found that EDD recorded six tax liens against Besthost on various dates in 2019 and 2020.  A true and correct printout from the Secretary of State's website showing all the liens recorded against Besthost is attached as Exhibit B.


Executed on January 6, 2022, at Whittier, California.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.


_____
Nicholas Gebelt

MOTION FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL

SDG-11-26-21-01-NWG

| In re: | CHAPTER: **11** |
|---|---|
| **Besthost Inn, LLC** | CASE NUMBER: **8:22-bk-10014-ES** |
| Debtor(s). | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**15150 Hornell Street**
**Whittier, CA 90604**

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND DEBTOR' S EMERGENCY MOTION FOR ORDER AUTHORIZING INTERIM USE OF CASH COLLATERAL PURSUANT TO FRBP 4001(b), LBR 2081-1(a)(9), AND LBR 9075-1**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **01/07/2022** , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**Nicholas W Gebelt on behalf of Debtor Besthost Inn, LLC**
**ngebelt@goodbye2debt.com**

**Michael J Hauser on behalf of U.S. Trustee United States Trustee (SA)**
**michael.hauser@usdoj.gov**

**Abel Ortiz on behalf of Creditor Pannam Corp.**
**Abel.ortiz@kts-law.com, danielle.pratali@kts-law.com**

**Mark M Sharf (TR)**
**mark@sharflaw.com, C188@ecfcbis.com;sharf1000@gmail.com**

**United States Trustee (SA)**
**ustpregion16.sa.ecf@usdoj.gov**

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On _____ , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**To be served according to the Court's instructions after it rules on the related application for hearing on shortened notice.**

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 7, 2022 | Nicholas Gebelt 217362 | /s/ Nicholas Gebelt |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# Exhibit A

# OPERATING AGREEMENT

## OF

### Besthost Inn, LLC.

THIS OPERATING AGREEMENT ("Agreement") is adopted and approved as of the effective date provided for below by and among the undersigned (hereinafter referred to individually as a "Member" and collectively as the "Members").

The parties have formed a limited liability company and this Agreement has been executed to state their agreements regarding their rights, duties, and obligations and the regulation, management, and conduct of the company's business and affairs.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the Members agree as follows:

## ARTICLE I
## THE COMPANY

Section 1.01. Formation and Name of the Company

(a)    The Members have formed a limited liability company (the "Company") for the purposes and scope set forth in the Company's Articles of Organization as limited herein. The Company shall operate and conduct its business and affairs under the name of Besthost Inn, LLC and, from and after the date hereof, the Company shall be operated and the Members' rights with respect to each other as well as the Company shall be determined in accordance with the terms hereof.

(b)    Except as otherwise expressly provided in this Agreement and the Company's Articles of Organization, the rights and obligations of a Member and the administration and termination of the Company shall be governed by the California Company Act (the "Act"). A Member's interest in the Company and in all of its assets (including real property) shall be personal property for all purposes. All real and other property, irrespective of its nature, owned by the Company shall be held to be owned by the Company as an entity and, accordingly, no Member shall have the right to seek partition of any property of the Company during the term of this Agreement, nor shall any Member make application to any court for authority or prosecute any action or proceeding for partition and the sale of any Company property.

Mike Initials   _MR_
1/24                         Cuong Initials  _CQN_

Section 1.02. Purpose and Scope of the Company

(a)     The purpose and character of the business of the Company shall be to own, operate, and manage hotel properties.

(b)     Nothing in this Agreement shall be deemed to restrict in any manner the freedom of a Member to conduct any other business or activity whatever (whether similar or dissimilar or competitive with the business of the Company or not) without any accountability to the Company or any Member thereof.

(c)     **The Members own the Property in the following interest:**

| | |
|---|---|
| **Michael Reazuddin** | **50%** |
| **Cuong Nguyen** | **50%** |

Section 1.03. Title to Property

**Property is leased from Pannam Corp.**

Section 1.04. Address of the Company

**8530 Beach Blvd.**
**Buena Park, CA 90620**

Section 1.05. Scope of Members' Authority

Except as otherwise expressly and specifically provided in this Agreement, no Member shall have any authority to act for, or assume any obligations or responsibility on behalf of, any other Member or the Company.

Mike Initials _MR_    Cuong Initials _CQN_
2/24

## ARTICLE II
## MANAGEMENT

Section 2.01. Management of the Company

(a) **The Operator, Michael Reazuddin** shall be responsible for and shall have the authority to conduct the routine, day to day business and affairs of the Company, at the expense and on behalf of the Company, including any Major Decisions approved by the Members, including, but not limited to, the following:

    (1) Perform other business functions and otherwise manage and operate the daily business and affairs of the Company, including, but not limited to, spending Company funds in the operation and maintenance of the Company and its properties, the establishment of such reserves as they may determine for upkeep, maintenance, protection, insurance, replacement, taxes, and other required disbursements of Company income, and determining the amounts and time Company funds are to be distributed to the Members; Keeping all Daily Audit reports and other records of the Company;

    (2) Execute in behalf of the Company promissory notes, mortgages, contracts, leases, and other agreements received for the construction, maintenance, and operation of the Company's business; and,

    (3) Maintain or cause to be maintained adequate public liability, fire, and extended coverage, worker's compensation and other insurance required to protect the interest of the Members and Company.

(b) **The Accounts Bookkeeper, Cuong Nguyen** shall be responsible for and shall have the authority to conduct the routine, day to day business and affairs of the Company, at the expense and on behalf of the Company, including any Major Decisions approved by the Members, including, but not limited to, the following:

    (1) Maintain all funds of the Company in a bank or banks selected by them;

    (3) To the extent that funds of the Company are available therefore, pay its debts and other obligations;

    (4) Supply each Member with an annual summary in sufficient detail as shall enable each Member to prepare his state, federal, and local income tax returns, and cause to be prepared the federal, state, and local tax returns

Mike Initials _MR_

Cuong Initials _CQN_

3/24

which may be required of the Company;

(5)     Make distributions periodically to the Members;

(c)     Notwithstanding the provisions of paragraph (a) above, no act shall be taken, sum expended, decision made, or obligation incurred by the Company or any Member with respect to a matter within the scope of any of the major decisions (hereinafter called "Major Decisions"), as enumerated below, unless such Major Decision has been "approved by the Members." The Major Decisions are:

(1)     Acquisition of any real or personal property other than the Property as described in Section 1.02(a), except the acquisition of any personal property with a cost (or aggregate cost in the case of related items or transaction) less than **$1,000.00**;

(2)     The sale, exchange, transfer, mortgage, or other encumbrance of any of the Company's property;

(3)     Dissolution and liquidation of the Company;

(4)     Borrowing or lending of Company funds, including refinancing of any Company loan;

(5)     Any other decision or action which by an express provision of this Agreement is required to be approved by the Members;

(6)     Requiring capital contributions in excess of the total aggregate amount of **$5,000.00** considering the total sum of every additional capital contribution made by the Members during the term of this Agreement; provided, however, that this limitation shall not be applicable to capital contributions necessary to repay Company indebtedness as to which any one or more of the Members has personal liability that is not repaid out of Company assets, which capital contributions the Members expressly agree shall be required and shall be paid by the Members in accordance with their respective Distribution Percentage Interests;

(7)     Changing the principal business or purpose of the Company;

(8)     Entering into a lease for the Company's property having a term of three years or more;

(9)     Incurring a repair expense or capital expenditure in excess of **$5,000.00**;

Mike Initials _____MR_____        Cuong Initials ___C&N___
4/24

(10)   Employing or terminating a property management company;

(11)   Employing the accountants, attorneys, consultants, and other persons or firms necessary or desirable to carry on the business of the Company;

(12)   Approving the Company's annual operation budget;

(13)   Establishing a schedule of rental rates for the leases of property owned by the Company, approving the terms of the leases to be utilized by the Company and establishing guidelines regarding the creditworthiness of proposed tenants for the Company's leases of property; and,

(14)   Any other decision or action which, considered before making the decision or taking the action, would reasonably have been expected to have a substantial or material effect upon the Company as contrasted with a decision or action which would be routine or in the ordinary course of business of the Company.

(d)   The phrase "approved by the Members" as used in this Agreement means a decision or action approved by those Members not in default under this Agreement at the time the vote is taken or decision is made who own 100% of all the "Distribution Percentage Interests" (as defined in Section 3.01 hereof) owned by Members not in default under this Agreement at the time the vote is taken or decision is made. The approval by sufficient Members authorized to make such a decision shall be effective whether votes are cast at a meeting of Members (and whether or not all of the Members are in attendance at such meeting), or by formal or informal, oral or written instructions of such Members, or otherwise, and such determination so made by the Members shall be effective and legally binding upon all the Members, regardless of the number of Members who may actually vote or otherwise participate therein. In no event shall a Member who is in default under this Agreement at the time a vote is taken or decision is made be entitled to participate therein, and such Member shall not be eligible to vote.

(e)   The Company shall indemnify and save harmless the Administrator from any loss, damage, liability or expense incurred or sustained by them by reason of any act performed by them or any omission on their part to act for or in behalf of the Company and in furtherance of its interest provided that the Administrator acted in good faith and in a manner the Administrator reasonably believed to be in or not opposed to the best interests of the Company. The Administrator Cashall not be liable for any honest mistake in judgment or for any inadvertent failure to perform any of their obligations hereunder, or for any loss due to such mistake or failure to perform, or due to the negligence, dishonesty, fraud, or bad faith of any employee or other agent of the Company.

Mike Initials _MR_    Cuong Initials _CDN_
5/24

Section 2.02.  <u>Appointment and Replacement of Administrator</u>

    (a)    There shall at all times be at least one Administrator designated by the members.

    (b)    Cuong Nguyen is designated as Administrator.

    (c)    Any third party is authorized to rely on an executed copy of this Agreement as to the designation and authority of the Administrator and shall not be required to make further inquiry or investigation.

Section 2.03.  <u>Meetings of Members</u>

    (a)    At any time requested by any Member upon at least 10 days' prior written notice, the Members shall meet to discuss and review:

        (i)    The actions and performance of the Administrator in conducting the day-to day business of the Company;

        (ii)    The performance of any property management company, attorney, accountant, consultant, and other persons performing services for the Company;

        (iii)    The Company's business performance and financial condition;

        (iv)    The rents, lease terms, tenant mix, and other relevant aspects of the Company's property;

        (v)    Any Major Decisions requiring action by the Members; and,

        (vi)    Such other and further business of the Company as may be brought before the Members.

    (b)    The presence of Members holding 100% of the Distribution Percentage Interests shall constitute a quorum at any meeting of the Members. A vote at any such meeting by more than fifty percent of the Distribution Percentage Interests present shall be sufficient to authorize and approve any matter considered at the meeting, except any Major Decision, the approval of which shall be governed by Section 2.01(b) above. Written minutes of each meeting of the Members shall be taken and shall be kept and maintained as a part of the books and records of the Company.

Section 2.04.  <u>Payments to the Administrator</u>

The Administrator shall be reimbursed by the Company for his expenses incurred on behalf of the Company, including travel, lodging, and the portion of their respective office expenses attributable to handling Company business but otherwise shall not be entitled to any compensation for his acting in such capacity unless otherwise agreed to

Mike Initials _MN_

6/24

Cuong Initials _CQN_

by all of the Members.  It is understood that the Administrator is not required to furnish services normally performed by a real estate broker or a property manager.  The Company may contract for such services with any Member or any firm with which he is affiliated, provided that such a contract is approved by the Members.

Section 2.05.  <u>Contracts with Related Parties</u>

The fact that a Member or a member of his family is employed by or is directly or indirectly interested in or connected with any person, firm, or corporation employed by the Company to render or perform a service shall not prohibit the Administrator from employing such person, firm, or corporation (including any of the Members) or from otherwise dealing with him, them, or it, and neither the Company nor the Members shall have any rights in or to any income or profits derived there from as a consequence of the relationship created under this Agreement.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

Section 3.01.  Initial and Additional Capital

(a)  The Members' respective percentage interests ("Distribution Percentage Interests") in the Company (including Company net income, gain, loss, deduction, and credits), prior to any adjustments to the Distribution Percentage Interests required by this Agreement, are set forth in Exhibit A attached hereto.  A separate capital account shall be maintained for each Member in accordance with Treasury Regulation 1.7041 (b) (2) (iv) or any applicable successor Treasury Regulation.

(b)  The Members acknowledge that from time to time hereafter, the Company may require capital funds for the payment of debts and liabilities of the Company, including the indebtedness secured by any mortgage, deed of trust or other liens thereon, for taxes and insurance, debt service, and other carrying charges and expenses, and to provide operating capital. The Members agree from time to time to contribute additional cash to the Company in their respective Distribution Percentage Interests to the extent reasonably required for the purposes set forth above or for any other proper business purpose subject only to the provisions of Section 2.01(b)(6).

(c)  Should any Member fail or refuse for any reason whatsoever to contribute in cash the additional capital amount which he is required to contribute within 10 days after the due date for payment of such amount (the "Unpaid Required Contribution"), such Member shall be in default hereunder and shall be deemed to be a "Defaulting Member" and the

Mike Initials _MR_         Cuong Initials _CQN_
7/24

following shall apply:

(1)    By executing this Agreement, each Member shall be deemed to have granted to
the Company a first and prior lien and security interest upon such Member's
interest in the Company (including his capital account, the Company assets and
property, and any future distributions to which such Defaulting Member would
otherwise be entitled under this Agreement) as security for the payment of all
additional capital contributions of such Member.  This Agreement shall be
deemed to be a security agreement with respect to such security interest and
collateral and each Member shall promptly execute and deliver to the Company
any financing statements or other instruments that the Company, or any other
Member, may request for purposes of perfecting or continuing such security
interest.  Upon the failure of a Member to execute and deliver such financing
statements or other instruments, the other Members, and each of them, as
attorney in fact for such Member, may execute and deliver such financing
statements or other instruments for, in the name, and on behalf of such Member.
With respect to a Defaulting Member, the Company, acting upon a decision
approved by the Members, shall have all of the rights and remedies of a secured
party under the California Uniform Commercial Code, including, without
limitation, and in addition to the rights under such law, the right to sell, free from
any right of redemption, by public or private sale upon five days' advance
notice to the Defaulting Member, the Defaulting Member's Company interest or
any part thereof.  In addition, the Company shall have the right to retain and
setoff against the Unpaid Required Contribution of a Defaulting Member and
any accrued interest thereon all amounts becoming otherwise distributable or
payable to such Defaulting Member by the Company.  Any amount so retained
and setoff by the Company shall be deemed to be a constructive cash
distribution to the Defaulting Member and a constructive payment by him to the
Company.  Any payment, whether constructive or actual, shall be applied first
against any unpaid accrued interest on the Defaulting Member's Unpaid
Required Contribution and the remainder shall be applied against his Unpaid
Required Contribution.

(d)    Any Member(s) not in default hereunder shall have the right (but not the obligation),
without waiving or releasing any Defaulting Member of the obligations under this
Agreement, to pay an Unpaid Required Contribution to the Company and thereby be
entitled to all of the rights and remedies of the Company against the Defaulting Member
provided in Section 3.01(c).

Section 3.02.  Company Obligations

(a)    In the event the Company obtains any loan or incurs any expense or liability as to which
any one or more Members have personal liability, each Member hereby agrees that, to

Mike Initials  _MR_          Cuong Initials  _CQN_
8/24

the extent the Company does not pay said loan, expense or liability in whole or in part, for any cause whatsoever, each Member shall be responsible for payment thereof in the percentage set forth opposite his name on Exhibit A including with respect to loans the principal of said loan and all accrued interest and other charges, if any, thereon, or any portion thereof then becoming due.  In the event any Member shall default in the foregoing obligation (a "defaulting member"), and if such default shall continue for a period of five days, then any one or more of the Members not in default (the "nondefaulting members") shall be entitled (i) to pay or refinance all or any portion of the amounts due and (ii) to proceed against the defaulting member(s) to collect all amounts paid on behalf of the defaulting member(s), plus interest thereon at the rate of two percentage points above the prime rate as published by Wells Fargo Bank of Buena Park, N.A. (adjusted monthly on the first day of each month), costs and the fees of an attorney, for which amount the defaulting member(s) shall be liable to the nondefaulting members in proportion to the amounts advanced and paid by the nondefaulting member on behalf of the obligations of the defaulting member.  If all Members default under the above obligation, any loss or expense suffered as a result of such default shall be borne by each Member pro rata in accordance with the percentages set forth opposite each Member's name.  Any Member who suffers a loss in excess of such percentage shall have a right to recover against the other Member(s) for any such excess loss to the extent that such Member did not share such loss in accordance with said percentage allocation set forth herein.

(b)    By executing this Agreement, each Member shall be deemed to have granted to the other Members a lien and security interest subordinate only to the lien and security interest described in Section 3.01(c) upon such Member's interest in the Company (including his capital account, the Company assets and property, and any future distributions to which such defaulting member would otherwise be entitled under this Agreement) as security for the payment of all obligations under this Section 3.03.  This Agreement shall be deemed to be a security agreement with respect to such security interest and collateral and each Member shall promptly execute and deliver to the Company any financing statements or other instruments that the Company, or any other Member, may request for purposes of perfecting or continuing such security interest.  Upon the failure of a Member to execute and deliver such financing statements or other instruments, the other Members, and each of them, as attorney in fact for such Member, may execute and deliver such financing statement or other instruments for, in the name and on behalf of such Member.    With respect to a defaulting member, any non-defaulting members who cure a default as aforesaid shall have all of the rights and remedies of a secured party under the California Uniform Commercial Code, including, without limitation, and in addition to the rights under such law, the right to sell, free from any right of redemption, by public or private sale upon five days advance notice to the defaulting member, the defaulting member's Company interest or any part thereof.  Upon sale, the proceeds thereof, after deducting all costs and expenses of every kind, shall be applied to the repayment of all sums advanced by those non-defaulting members rectifying the default, including interest, attorneys' fees, and costs.    The



Mike Initials  _MiR_
9/24

Cuong Initials  _CQN_

balance, if any, over and above such indebtedness shall be paid to the defaulting member in full and complete payment for all of his interest in the Company and in release of any rights he may assert or claim against the Company. In addition the nondefaulting members shall have the right to receive and setoff against the amount so advanced and any accrued interest thereon all amounts becoming otherwise distributable or payable to such defaulting member by the Company. Any amount so received and setoff shall be deemed to be a constructive cash distribution to the defaulting member and a constructive payment by him to the nondefaulting Members. Any payment, whether constructive or actual, shall be applied first against any unpaid accrued interest on the amounts advanced.

(c)     Notwithstanding the foregoing, if any claim, liability, or expense shall be asserted against the Company or any Member by reason of the sole negligence of any Member or an act or omission by a Member in violation of this Agreement, then the Member committing such negligence or performing such act shall indemnify and save harmless the Company and the other Members from and against any and all loss resulting there from. The right of contribution and rights of indemnity contained in this paragraph shall survive and remain in full force and effect notwithstanding any termination of the Company and this Agreement. The provisions of this paragraph are not intended to and shall not be applicable to any claim or liability with respect to any mortgages, loans, deeds of trust, or other encumbrances which are non-recourse as to the Company and the Members.

## ARTICLE IV
## ACCOUNTINGS, PROFITS, AND DISTRIBUTIONS

Section 4.01.  Determination of Profits and Losses

The profits and losses of the Company shall be considered to have been earned rat ably over the period of the fiscal year of the Company, except that profits and losses arising from the disposition of assets or refinancing of mortgages shall be deemed earned as of the date thereof. Profits and losses for all purposes of this Agreement shall be determined in accordance with the generally accepted accounting principals utilized by the Company for federal income tax purposes.

Section 4.02.  Allocation of Profits and Losses

(a)     For fiscal years in which there are no changes in the Distribution Percentage Interests of the Members, the net profits or net losses of the Company shall be credited or charged to the Members in accordance with the Distribution Percentage Interests.

(b)     For fiscal years in which there are changes in the Distribution Percentage Interests of the Members, the profits or losses for that year shall be allocated to each period of the year for which there were different Distribution Percentage Interests based upon the date such profits or losses were earned. The net profits or net losses of the Company for a given period of the year shall be

Mike Initials  _MM_    Cuong Initials  _CQN_
10/24

credited or charged to the Members in accordance with the Distribution Percentage Interests of the Members for that period.

(c)    To the extent required by Section 704(c) of the Internal Revenue Code and any Treasury Regulations thereunder and in accordance with the provisions thereof, (i) income, gains, loss and deductions with respect to all property contributed to the Company by a Member shall be shared among the Members for tax accounting purposes so as to take account of the variation between the basis of the property to the Company and its fair market value at the time of contribution, and (ii) similar rules shall apply with respect to contribution by a cash basis Member of accounts payable and other accrued but unpaid items.

Section 4.03.    Determination of Net Distributable Cash: Distributions

(a)    The term "net distributable cash" as used in this Section 4.03 means with respect to a Company fiscal year, the taxable income of the Company for federal income tax purposes for that fiscal year, except (i) depreciation of real property or personalty, investment tax credits and similar non cash deductions from income shall not be considered a deduction, (ii) loan amortization payments shall be considered a deduction, (iii) amounts expended for the acquisition, improvement or repair of Company property and similar capital costs not normally chargeable to current operations shall be treated as a deduction, (iv) to the extent included in taxable income, the net proceeds of mortgage refinancing or the sale of Company property or any part thereof shall be deducted from taxable income, and (v) contributions to reserves which are established for working capital, approved expenses, or other contingencies, all in amounts approved by the Administrator, shall also be treated as deductions. Subject to Sections 3.01(c) and 3.03, net distributable cash shall be apportioned among the Members in accordance with subsections (b) and (c) below and
**Distributable cash funds in Savings account shall remain in account as a reserved for working capital and exigencies. No set frequency of distributions is set. Distributions of funds is determined by approval of all members of Besthost Inn, LLC.**

(b)    For fiscal years in which there are no changes in the Distribution Percentage Interests of the Members, the net distributable cash of the Company shall be allocated to the Members in accordance with the Distribution Percentage Interests.

(c)    For fiscal years in which there are changes in the Distribution Percentage Interests of the Members, the net distributable cash for that year shall be allocated to each period of the year for which there were different Distribution Percentage Interests as though such net distributable cash were earned ratably over the fiscal year. The net distributable cash of the Company for a given period of the year shall be allocated to the Members in accordance with Distribution Percentage Interests of the Members for that period.

(d)    In the event that money shall be available for distribution among the Members by reason of mortgage refinancing or sale of property, all such moneys, less any amount approved by the Administrator to be reserved by the Company for working capital, expenses, or other contingencies,

Mike Initials  _MR_          Cuong Initials  _CQN_
11/24

shall be promptly distributed among the Members in accordance with the Distribution Percentage Interests as of the date of such refinancing or sale.

Section 4.04.  Fiscal Year; Books and Records

(a)    The fiscal year of the Company shall be the calendar year.

(b)    Each Member shall have the right at all reasonable times during usual business hours to audit, examine, and make copies of or extracts from the books of accounts of the Company. Such right may be exercised through a designated agent or employee.  Each Member shall bear all expenses incurred in any examination made for such Member's account.

Section 4.05.  Bank Accounts

Funds of the Company shall be deposited in an account or accounts of a type, in form and name and in a bank or banks selected by the Administrator, and withdrawals from such bank accounts shall be made by the Administrator or the person or persons authorized by them.

Section 4.06.  Tax Matters

(a)    Any provision of this Agreement to the contrary notwithstanding, solely for federal income tax purposes, each of the Members hereby recognizes that the Company will be subject to all provisions of Sub-chapter K of Chapter 1 of Subtitle A of the Internal Revenue Code; the filing of Company's federal tax returns shall not be construed to extend the purposes of the Company or expand the obligations or liabilities of the Company.

(b)    The Administrator are hereby designated as the "Tax Matters Partner" of the Company pursuant to applicable provisions of the Internal Revenue Code and the regulations thereunder; provided, however, the Tax Matters Partner shall not file any instrument, petition or document either (i) extending the statute of limitation for the Company, or (ii) asking for readjustment of any Company taxable items of income, expense, deduction and/or credit or otherwise with the United States Tax Court, a United States District Court or the United States Court of Claims, unless the decision to file such instrument, petition, or document has been approved by the Members.

Section 4.07.  Special Allocations

It is the intent of the Members that all income, gain, loss, deduction, and credits shall be allocated to the Members' book capital accounts and that all distributions shall be disbursed to the Members such that, at all times, the book capital account balances of the Members shall bear the same relationship one to the other as the Members' Distribution Percentage Interests.  If it is proposed or contemplated that an allocation, distribution or other matter be effected in a manner that will cause the book capital account balances of the Members to no longer bear the same relative relationship as the

Mike Initials _MR_    Cuong Initials _CQN_
12/24

Members' Distribution Percentage Interests (a "Special Allocation"), the Members and their respective tax and legal counselors will negotiate to amend this Agreement to provide the provisions deemed necessary to accommodate the Special Allocation. If no agreement is reached by the Members within a reasonable period of time, the Special Allocation will be abandoned and the Members will continue to be bound by and conduct their affairs in accordance with the terms of this Agreement as then in effect.

## ARTICLE V
## WITHDRAWAL

### Section 5.01. Voluntary Dissolution

Anything in this Agreement to the contrary notwithstanding, the powers of the parties hereto to effect a dissolution of the Company at any time shall be governed by the provisions of the Act but this shall not be construed to authorize any Member (nor shall any Member have the right) to withdraw or retire from the Company, except as otherwise in this Agreement expressly provided.

### Section 5.02. Death or Legal Incompetency

(a) On the death or legal incompetency of a natural, individual Member (as compared to a legal entity) or the dissolution of Member that is a legal entity, (such Member hereafter sometimes referred to as the "Deceased Member"), the executor or administrator of the deceased Member or the guardian of the legally incompetent Member shall have the option, within a period of 120 days following the death or incompetency of such Member or 90 days following the granting of letters in the estate, whichever is earlier, to elect in writing to become a Member with all the rights and subject to all the duties and responsibilities previously incumbent upon the Deceased Member. So long as such election to remain a Member is made validly by such legal representative of the Deceased Member, then prior to the distribution of said Company interest to its legatee, the estate of the Deceased Member shall be treated for all purposes as a Member.

(b) Should the estate of the Deceased Member not elect to continue as a Member, the other Members shall have first option to purchase the entire interest of the Deceased Member in the Company for the price, in the manner, and on the terms and conditions set forth in Section 5.06 below.

(c) If the other Members (or one or more of them) elect to purchase the Deceased Member's entire Company interest, they shall give notice in writing of such election to the Deceased Member's personal representative within a period of 30 days following receipt of written notice that the

Mike Initials _MR_     Cuong Initials _CQN_
13/24

Deceased Member's personal representative has elected not to continue to hold the Company interest or the lapse of the notice period provided in subparagraph (b) above, whichever first occurs. The election of the other Members to purchase a portion not aggregating the whole of the Deceased Member's Company interest shall be of no effect.

(d)    If the other Members do not elect within the time and in the manner herein provided to purchase the entire Company interest of the Deceased Member, the estate of the Deceased Member shall be free to sell such Company interest to whomever it desires.

Section 5.03.  Insolvency

(a)    If a Member shall at any time commit or suffer an "Act of Insolvency," such Member (or such Member's trustee in bankruptcy, receiver or creditors, as the case may be) shall be obligated to sell to the other Members, and the other Members shall have the right, but not the obligation, to purchase, the Company interest of the Member committing the "Act of Insolvency" for the price, in the manner and on the terms and conditions set forth in Section 5.06 below. An "Act of Insolvency" shall be deemed to have occurred in the event a Member (i) files a voluntary petition under the Bankruptcy Code or there shall be an order for relief entered against him under the Bankruptcy Code; or, (ii) causes or suffers the appointment of a receiver, trustee or other similar party for or over all or substantially all of his assets; or, (iii) makes a general assignment for the benefit of his creditors.

(b)    If the other Members (or one or more of them) elect to purchase the entire Company interest of the Member committing the Act of Insolvency, they shall give notice in writing of such election to such Member (or such Member's trustee in bankruptcy, receiver or creditors, as the case may be) within 60 days following the date the last of the Administrator receives written notice of the Act of Insolvency. The election of the other Members to purchase a portion not aggregating the whole of the Company interest of the Member committing the Act of Insolvency shall be of no effect.

Section 5.04.  Withdrawal

(a)    No Member shall have the right to withdraw from the Company before the end of the term fixed for its duration. The Members acknowledge that the withdrawal of any Member will cause irreparable damage to the remaining Members and the Company.

(b)    If any Member (herein "Withdrawing Member") attempts to withdraw or to otherwise liquidate the Company or partition its property in a manner contrary to this Agreement ("Prohibited Action"), the remaining Members may, in addition to any other remedy they may have at law or in equity, elect to purchase the Withdrawing Member's entire Company interest for the price, in the manner and on the terms and conditions set forth in Section 5.06 below; provided, however, that the purchase price to be paid shall be only eighty percent of the purchase price otherwise determined under Section 5.06.

(c)    If the remaining Members (or one or more of them) elect to purchase the entire Company interest of the Withdrawing Member, they shall give notice in writing of such election to the

Mike Initials _**MR**_    Cuong Initials _CQN_
14/24

Withdrawing Member within 60 days following the date the last of the Administrator receives written notice of the Prohibited Action.  The election of the remaining Members to purchase a portion not aggregating the whole of the Company interest of the Withdrawing Member shall be of no effect.

Section 5.05.  Decree of Dissolution

(a)    If the condition or actions of any Member (herein "Causing Member") gives rise to the filing of a suit seeking a decree of dissolution by a court pursuant to any applicable provision of California law, the Causing Member shall be obligated to sell to the other Members, and the other Members shall have the right, but not the obligation, to purchase, the Causing Member's Company interest for the price, in the manner and on the terms and conditions set forth in Section 5.06 below.

(b)    If the other Members (or one or more of them) elect to purchase the entire Company interest of the Causing Member, they shall give notice in writing of such election to the Causing Member within 60 days following the date the last of the Administrator receives written notice of the filing of the suit seeking dissolution.  The election of the other Members to purchase a portion not aggregating the whole of the Company interest of the Causing Member shall be of no effect.

Section 5.06.  Purchase Terms

(a)(1)   The purchase price for any Company interest to be purchased pursuant to Section 5.02, 5.03, 5.04, or 5.05 shall be the book value thereof as it appears upon the books and records of the Company as of the close of business on the date of the event giving rise to the right of purchase being exercised, as adjusted by substituting in place of book value the fair market value of the property, both real and personal, owned by the Company as of such date.  Such book value, adjusted as provided in the next paragraph, shall be computed by the bookkeeper or accountant regularly employed by the Company in accordance with the accounting practices regularly followed by the Company and, in cases not covered by such practices, in accordance with good accounting practice. No allowance shall be made for intangible assets except as those assets have been reflected on the Company books before the event giving rise to the right of purchase being exercised.  Such book value shall include and reflect the accounting year as shown on the Company books, increased by the share of Company profits or decreased by the share of Company losses allocable to the interest being purchased, computed as herein provided, for the period from the beginning of the accounting year in which the event giving rise to the right of purchase being exercised occurred until the date of the event giving rise to the right of purchase being exercised and increased by contributions and decreased by withdrawals during such period.

(a)(2)   In making the adjustment for the fair market value of real estate, the bookkeeper or accountant shall rely on and use a value agreed upon in writing by the parties to the sale, but if they are unable to reach such agreement within 60 days after the purchasing Members give notice of their intention to buy (which time may be extended by the agreement of all parties), then the fair market value of such property shall be determined by written appraisal made by a board of three appraisers who are qualified to act.  One of said board shall be selected by the seller of the Company interest being

Mike Initials  _MMR_

Cuong Initials  _CQN_

15/24

purchased, one by the purchasing Members, and the third by the two appraisers so selected. In the event of any disagreement among the three, the decision of two of the three appraisers shall be binding on all parties in interest. A statement showing such book value, as thus adjusted, shall be completed by the bookkeeper or accountant and copies delivered to the parties to the sale as soon as may be reasonable. Such book value, as so adjusted, less a discount of fifteen percent of book value for lack of marketability and as set out in the accountant's or bookkeeper's statement, shall constitute and be deemed to be the purchase price for the Company interest being purchased (except as otherwise provided under Section 5.05(b)) and shall be binding upon all parties. The cost of such appraisals shall be paid by the Company, but the cost thereof shall be taken into account in determining the purchase price for the Company interest being purchased.

(b)     Unless otherwise agreed, each remaining Member shall have the right to purchase that portion of the Company interest being purchased computed by the proportion which each purchasing Member's Distribution Percentage Interest bears to the Distribution Percentage Interest of all of the purchasing Members. The election of the remaining Members to purchase a portion not aggregating the whole of the Company interest to be purchased shall be of no effect.

(c)     If the entire Company interest so offered is accepted for purchase by two or more purchasing Members, the portion of the purchase price payable by each purchasing Member shall be the sum determined by multiplying the purchase price for the entire Company interest by the fraction representing the portion thereof purchased by such purchasing Member.

(d)     The purchase price due from each purchasing Member shall be paid by such purchaser either in cash or in the following installments: twentyfive percent thereof in cash on the closing date, and the balance by each such purchasing Member's execution and delivery of three promissory notes, each dated as of the closing date, each in the principal amount of twentyfive percent of the purchase price, each payable with interest at the prime rate then charged by the Commerce Bank of Kansas City, N.A., the first of such notes to be payable one year after the date of closing, and the remaining two notes to be payable successively each year thereafter. Such notes shall provide for the privilege of prepayment at any time without premium or penalty and shall recite that all such notes shall become due at the option of the holder if all or any part of the principal or interest due on any such note remains unpaid for 30 days after it matures. Repayment of the notes shall be secured by a pledge of the Company interest being purchased. The closing date for the sale shall be the thirtieth day after notification to the parties of the purchase price as established by the Company's bookkeeper or accountant.

## ARTICLE VI
## SALE, TRANSFER, OR OTHER DISPOSITION

Section 6.01.  Transfer

(a)     Unless otherwise consented to by all of the Members, the Members and any other persons who may hereafter own an interest in the Company shall not mortgage, pledge,

hypothecate, or encumber, in any manner, voluntarily or involuntarily, their respective interests in the Company, except as herein expressly authorized.

     (b)    No Member or other person owning an interest in the Company shall transfer, assign, or convey any or all of his interest in the Company unless he has made an offer to sell such interest to the other Members as follows:

     (1)    If any Member receives an offer to buy any or all of his Company interest which such Member is willing to accept or if any Member makes an offer to sell any or all of his Company interest which the offeree is willing to accept (such Member being referred to hereafter as the "Selling Member," the proposed purchaser being referred to as the "Purchaser" and the interest to be sold being referred to as the "Offered Interest"), such Member shall give all the other Members notice that an offer exists and a true copy or recitation of the terms thereof. The other Members shall have the right to purchase such Company interest and take the place of the Purchaser, provided that one or more of them agrees to the price and conditions theretofore agreed upon by the Selling Member and the Purchaser within 30 days after receipt of written notice that an offer exists and a true copy or recitation of the terms thereof; if more than one Member exercises the right of purchase herein granted, each such Member shall have the right to purchase that portion of the Offered Interest computed by the proportion which each such Member's Distribution Percentage Interest bears to the Distribution Percentage Interest of all of the Members exercising the purchase rights herein granted; an election of the other Members to purchase a portion not aggregating the whole of the Offered Interest shall be of no effect.

     (2)    If no Member exercises the right of purchase herein set forth, then the Selling Member shall be authorized to sell the Offered Interest to the Purchaser, provided that such sale is on the same identical terms and conditions submitted to the other Members in accordance with this Section 6.01(b) and is consummated within the later to occur of the closing date established by the terms of the sale as submitted to the other Members or 60 days after the offering Member is authorized to sell his interest in accordance with this Section 6.01(b).

     (3)    Any notice required to be given hereunder shall be sufficient if actually received or if given by certified mail, return receipt requested, to the last known address of each addressee. The date of receipt of any notice given by certified mail will be the date stated on the return receipt signed by or on behalf of each addressee. Any future prospective purchaser of Company interests hereunder are hereby authorized to rely on the return receipt and the apparent genuineness of the date thereof and the signature thereon in determining whether this right of first refusal has lapsed with regard to any offer or contract to purchase any Company interest.

     (c)    Notwithstanding anything in this section to the contrary, each natural, individual

Mike Initials   _MR_       Cuong Initials  _CQN_

17/24

Member (as compared to a legal entity) owning an interest in the Company may make a testamentary disposition of his interest in the Company and may assign or transfer (by sale or otherwise) his interest or any part thereof in the Company if such sale or transfer is made to any member of his family or to any trust primarily for his benefit or the benefit of any member of his family. The term "member of his family" as used herein shall include only a spouse, child, grandchild, sister, brother, or any lineal descendants of any of the foregoing. All interests in the Company transferred, assigned, or bequeathed pursuant to the provisions of this paragraph (c) shall be subject to all the restrictions, agreements, and obligations set out in this Agreement.

        (d)     Notwithstanding anything in this section to the contrary, if any partnership is now or hereafter becomes a Member, such Member may assign or transfer (by sale or otherwise) its interest or any part thereof in the Company if such sale or transfer is made to a partner holding a partnership interest in the partnership which is a Member herein. All interests in the Company transferred or assigned pursuant to the provisions of this paragraph (d) shall be subject to all the restrictions, agreements, and obligations set out in the Agreement.

        (e)     Notwithstanding anything in this section to the contrary, if any trust is now or hereafter becomes a Member, such Member may assign or transfer (by sale or otherwise) its interest or any part thereof in the Company if such sale or transfer is made to a beneficiary under the trust that is a Member herein. All interests in the Company transferred or assigned pursuant to the provisions of this paragraph (e) shall be subject to all the restrictions, agreements, and obligations set out in this Agreement.

        (f)     In the event any Member's interest is sold, conveyed, transferred, assigned, or bequeathed, whether to another Member, a member of his family as defined above or any other person or party, the purchaser, assignee, or successor shall be obligated to make additional capital contributions to the same extent as his predecessor in interest would have been required to make and shall be subject to all the other terms and obligations herein imposed on the Member.

        (g)     Notwithstanding anything contained herein to the contrary, the purchaser, transferee, or assignee of any selling Member's interest shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The purchaser, transferee, or assignee of such selling Member's Interest shall only be entitled to receive the share of profits or other compensation by way of income and the return of contributions by way of income and the return of contributions, to which the transferor Member would otherwise be entitled; provided, however, that if a successor is not in default under this Agreement, he may by agreement of all the remaining Members upon execution of an agreement in form satisfactory to the remaining Members, become a Member.

        (h)     Any sale, assignment, gift, transfer, mortgage, conveyance, or other disposition of any interest in this Company, except as is expressly permitted hereunder, shall be void and of no force and effect, and may be ignored by the remaining Members.

ARTICLE VII

Mike Initials _MR_

18/24

Cuong Initials _CGN_

## DISSOLUTION AND TERMINATION

Section 7.01.  Dissolution

      (a)    The Company shall be dissolved upon the occurrence of any of the following events:

      (i)    when the period fixed for the duration of the Company shall expire or the happening of any event specified in this Agreement is resulting in dissolution;

      (ii)    by the unanimous written agreement of all Members;

      (iii)    entry of a decree of dissolution under R.S. Mo. § 359.789;

      (iv)    when the Company is not the surviving entity in a merger or consolidation; or,

      (v)    upon the death, retirement, resignation, expulsion, bankruptcy, dissolution of a Member or occurrence of any other event which terminates the continued membership of a Member in the Company (a "Withdrawal Event"), unless:

      (A)    within 90 days after the occurrence of a Withdrawal Event, all of the remaining Members deliver or mail to the Company at its principal business address stated above a written consent to continuing the business of the Company; and

      (B)    there are at least two remaining Members of the Company.

      (b)    As soon as possible following the occurrence of any of the events specified in this section requiring the dissolution of the Company, the appropriate representative of the Company shall execute a notice of winding up in such form as shall be prescribed by the Secretary of State of California and file same with the Secretary of State's office.

      (c)    Upon the filing with the Secretary of State of a statement of a notice of winding up, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until articles of termination have been filed with the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

Section 7.02.  Termination

      (a)    Upon the occurrence of an event that requires the Company be dissolved, the Members shall proceed with reasonable promptness to wind up the business and affairs of the Company in compliance with all the requirements of applicable law.  The profits and losses of the business during the period of winding up shall be divided among or be borne by the Members in the

Mike Initials  _MR_      Cuong Initials  _CQN_
19/24

respective percentages in which they shared in such profits and losses prior to the event which required the Company be dissolved.

(b)     If the Company is required to dissolve and its affairs be wound up as the result of the occurrence of an event other than a Withdrawal Event, the Company's assets shall be sold or otherwise liquidated as promptly as practicable (except to the extent any assets are distributed to the Members in kind) and the proceeds thereof shall be distributed in the following order of priority:

(1)     To the payment of the debts and liabilities of the Company and the expenses of liquidation;

(2)     To the establishment of any reserves approved by the Members as reasonably necessary for the contingent liabilities or obligations of the Company, but such reserve shall be held only so long as shall be approved by the Members, and at the expiration of such time the balance remaining shall be distributed in the manner provided in this section;

(3)     To the repayment of the capital contributions (initial and subsequent) of the Members, less all sums previously distributed to them for such purpose; but, if the amount available for such repayment shall be insufficient, then pro rata on account thereof; and, thereafter,

(4)     Any balance remaining shall be distributed among the Members in accordance with their respective Distribution Percentage Interests on the date of distribution.

(c)     If the Company is required to dissolve and its affairs be wound up as the result of the occurrence of a Withdrawal Event as provided in Section 7.01(a)(v), then, unless the remaining Members agree otherwise:

(1)     The Company's assets shall be distributed to the remaining Members in undivided interests as tenants-in common in accordance with their respective Distribution Percentage Interests on the date of distribution;

(2)     By such distribution and without any further action by the Company or its Members, the Members shall have assumed and be severally personally liable for all of the debts and liabilities of the Company, including the expenses of winding up the Company, in accordance with their respective Distribution Percentage Interests on the date of distribution; and,

(3)     The provisions of Section 3.03 shall survive the winding up and dissolution of the Company and be applicable to the Members in their capacity as tenants-in common.

Section 7.03.  Articles of Termination

(a)     When all of the property and assets of the Company have been applied and distributed as herein set forth, articles of termination shall be executed in duplicate, which articles shall set forth the information required by the Act.

Mike Initials _____    Cuong Initials ___CQN___
20/24

(b)      Duplicate originals of such articles of termination shall be delivered to the Secretary of State.

(c)      Upon the filing of the articles of termination, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Administrator, shall have authority to distribute any Company property discovered after dissolution, convey real estate, and take such other action as may be necessary on behalf of and in the name of the Company.

Section 7.04.   Return of Contribution Non recourse to Other Members

Except as provided by law, upon dissolution, each Member shall look solely to the assets of the Company for the return of its capital contribution.  If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash or other property contribution of one or more Members, such Member or Members shall have no recourse against any other Member or the Administrator.

## ARTICLE VIII
### GENERAL PROVISIONS

Section 8.01.   Notices

Whenever provision is made in this Agreement for the giving, service, or delivery of any notice, statement or other instrument, such notice shall be deemed to have been given, served, and delivered if mailed by United States registered or certified mail, return receipt requested, addressed to the party entitled to receive the same at the last known address of such party.  Except where otherwise specified in this Agreement, any notice shall be deemed to have been given, served, and delivered on the date when such notice was received by the addressee.

Section 8.02.   Governing Law

This Agreement and the obligations of the Members hereunder shall be interpreted, construed, and enforced in accordance with the laws of the State of California notwithstanding that some of the Members may be domiciled outside the State of California.

Section 8.03.   Entire Agreement

This Agreement contains the entire agreement among the parties relative to the formation and organization of the Company and its operation and supersedes any prior agreements in respect thereto.  No variations, modifications, or changes hereof shall be binding upon any part hereto unless set forth in an instrument duly executed by or in behalf of the Company and such party.

Section 8.04.   Severability

Mike Initials _**MR**_      Cuong Initials __CQN__
21/24

If any provision of this Agreement or the application thereof to any person or occurrence shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or occurrences shall not be affected thereby and shall be enforced to the fullest extent permitted by law.

Section 8.05.  Applicability

The covenants and agreements herein contained shall inure to the benefit of and be binding upon all the parties hereto and their respective heirs, successors, executors, administrators, and assigns.

Section 8.06.  Equitable Remedies

The rights and remedies of any of the Members hereunder shall not be mutually exclusive and the exercise of one or more of the provisions hereof shall not preclude the exercise of any other provision hereof.  Each of the Members confirms that damages at law are an inadequate remedy for a breach or threatened breach of this Agreement and agrees that in the event of a breach or threatened breach of any provision hereof, the respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it, limit, or affect any right or rights at maw or by statute or otherwise of any party aggrieved as against the other for a breach or threatened breach of any provision hereof, it being the intention hereof to make clear the agreement of the Members that the respective rights and obligations of the Members hereunder shall be enforceable in equity as well as at law or otherwise.

Section 8.07.  Attorneys' Fees

In the event of a breach of this Agreement, the breaching party shall pay to each of the non-breaching parties such parties' reasonable attorneys' fees and costs and shall protect, defend, and hold the other parties harmless from any and all claims, actions, damages, liabilities, and expenses in connection with damages incurred by third parties by any unauthorized act or conduct of such breaching party and from any loss or damage resulting to the Company or the non-breaching party on account of any unauthorized act or conduct of such breaching party.

Section 8.08.  Counterparts

This Agreement may be executed in several counterparts and all so executed shall constitute one agreement, binding on all parties hereto, notwithstanding that all parties are not signatory to the original or the same counterpart.

Section 8.09.  Effective Date

The date of this Agreement is the last date provided below.

Mike Initials _MR_            Cuong Initials _CQN_

22/24

Section 9.01
**Ownership:**

          **Mike Reazuddin   (Partner 1)** will contribute **$100,000** representing **50%** ownership of Besthost Inn, LLC, but will have **50% of profit and loss sharing**.  Interest on funds contributed is 10% = **$833.33 per month**.

          **Cuong Nguyen      (Partner 2)** will contribute **$100,000** representing **50%** ownership of Besthost, Inn, but will have **50% of profit and loss sharing**.  Interest on funds contributed is 10% = **$833.33 per month**.

**Operations:**

        **Partner 1: Mike will control 100% of hotel operations.**
**Mike will be compensated at $2,000 for his full time commitment in overseeing this project along with other project Grandview Hotel in Kansas City for additional $2,000. If less than 100% focus is attributed to the operations, then compensation will be off.**

        **Partner 2: Cuong will control the bookkeeping for $400 per month.  If Operations is unable to cover costs, Pannam will upfront this fee to be paid back to Pannam when the operations is able to. .**

**Bank:**

       Cuong, Partner 2 will be only signer on account.
       Mike will sign off invoices to be paid, Cuong will review invoices for Mike signature before paying issuing checks to pay invoices.

       **Mike will be only one with Credit Card for Besthost Inn, LLC.**

       **There will be 2 bank accounts for Besthost Inn, LLC.  Operating and Savings account.**

       **Operations Account will have enough funds per month to pay monthly expenses, to be determined, approximately $30,000 as of 2-25-2013.**

       **Savings Account(Money Market Account) is an account where the principle business funds will be deposited.**

       **Withdrawal of funds from account will requite two (2) signatures, Mike and Cuong.**

                  Mike Initials  _MR_       Cuong Initials  _CQN_
                  23/24

## Lease Info:

Lease of entire property on 8530 Beach Blvd to be $22,000.00 monthly plus property taxes and property insurance.

**For the first 12 months beginning March 1st, 2013; Lease to be $22,000.00, up to $4,135.00 can be waived in the case NET operations can not cover total Lease of $22,000.00.**

| | | |
|---|---|---|
| Property Taxes (Est.) | $38,421.63 / 12 | = $3,201.80 |
| Property Insurance (Est.) | $23,061.15 / 12 | = $1,921.76 |

Lease to start on March 1, 2013.

**Major Maintenance Issues on the property Pannam Corp. will lend the Besthost Inn, LLC up to $200,000 at a 10% interest rate.**

## Property Notice: Property's revoked Conditional Use Permit.

**Partners of Besthost Inn, LLC are aware that City has currently revoked the Property's Conditional Use Permit. Pannam, (Lessor) will cooperate with Besthost Inn, LLC (Lessee) on making corrections to get Conditional Use Permit for property reinstated. Besthost Inn, LLC (Lessee) has $200,000 in funds to cover all the renovations. In the case that these funds are depleted, Pannam Corp, (Lessor) will be able to lend up to $200,000 to Besthost Inn, LLC at 10% interest to make corrections to the property to get Conditional Use Permit reinstated.**

**Mr. Loc will become member of BestHost Inn, LLC and assume all of Cuong Nguyen's interest in the company prior to looking for financing loan.**

Michael Reazuddin                    Cuong Nguyen

## Option to buy Hotel:
**Lessee can exercise option to purchase the property anytime withing the 60 months of leasing the property with new loan from lender $4,300,000.00 in 60 months from March 1, 2013**

IN WITNESS WHEREOF, the parties have duly executed this Operating Agreement this 28th day of February, 2013.

## Besthost Inn, LLC

By: _____          By: _____
    Michael Reazuddin                       Cuong Nguyen

Mike Initials _____          Cuong Initials __CQN__
24/24

# Exhibit B

California
*Secretary of State*

UCC

Login

# UCC Search

Home

Search

Forms

Help

*UCC Documents have been processed through: 01/02/2022*

Print

**Disclaimer:** *This tool allows you to search the California Secretary of State's Uniform Commercial Code database for abstracts of information for lien notices that have been filed with this office. The UCC Search is updated as documents are filed. The data provided is not a complete or certified record.*

Besthost Inn, LLC

Advanced ⌄

Results: 7

| UCC Type | Debtor Information | File Number | Secured Party Info | Status | Filing Date | Lapse Date |
|---|---|---|---|---|---|---|
| Notice of State Tax Lien | BESTHOST INN LLC - BUENA PARK, CA | 197693563392 | EMPLOYMENT DEVELOPMENT DEPARTMENT - SACRAMENTO, CA | Active | 01/23/2019 | 01/23/2029 |
| Notice of State Tax Lien | BESTHOST INN LLC - BUENA PARK, CA | 207765226754 | EMPLOYMENT DEVELOPMENT DEPARTMENT - SACRAMENTO, CA | Active | 03/03/2020 | 03/03/2030 |
| Notice of State Tax Lien | BESTHOST INN LLC - BUENA PARK, CA | 197700845011 | EMPLOYMENT DEVELOPMENT DEPARTMENT - SACRAMENTO, CA | Active | 03/06/2019 | 03/06/2029 |
| Notice of State Tax Lien | BESTHOST INN LLC - BUENA PARK, CA | 207784978002 | EMPLOYMENT DEVELOPMENT DEPARTMENT - SACRAMENTO, CA | Active | 06/03/2020 | 06/03/2030 |
| Notice of State Tax Lien | BESTHOST INN LLC - BUENA PARK, CA | U200022096927 | EMPLOYMENT DEVELOPMENT DEPARTMENT - SACRAMENTO, CA | Active | 09/28/2020 | 09/28/2030 |
| Notice of State Tax Lien | BESTHOST INN LLC - BUENA PARK, CA | 197741860942 | EMPLOYMENT DEVELOPMENT DEPARTMENT - SACRAMENTO, CA | Active | 10/21/2019 | 10/21/2029 |
| Judgment Lien | BESTHOST INN, LLC - BUENA PARK, CA | U210114422930 | ROBERT P GOE - IRVINE, CA | Active | 12/30/2021 | 12/30/2026 |

1

# Exhibit C

**BESTHOST INN LLC - SIX MONTH INCOME-EXPENSE PROJECTION**

| | Jan 2022 | Feb 2022 | Mar 2022 | Apr 2022 | May 2022 | Jun 2022 |
|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | |
| **Income** | | | | | | |
| Total of rooms avilable per month | 86 | 86 | 86 | 86 | 86 | 86 |
| Average Occupancy* | 70% | 70% | 75% | 75% | 75% | 75% |
| No. of days /month | 31 | 28 | 31 | 30 | 31 | 30 |
| Average Daily Rate** | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 |
| Revenue Per Available Room | 52.50 | 50.81 | 54.44 | 54.44 | 58.13 | 58.13 |
| **Hotel** | | | | | | |
| Room Revenue | 139,965.00 | 135,450.00 | 145,125.00 | 145,125.00 | 149,962.50 | 149,962.50 |
| Miscellaneous Income | 5,700.00 | 5,140.00 | 6,320.00 | 6,320.00 | 6,375.00 | 6,375.00 |
| Total Hotel | 145,665.00 | 140,590.00 | 151,445.00 | 151,445.00 | 156,337.50 | 156,337.50 |
| **Other Revenue** | | | | | | |
| General admission | | | | | | |
| Disney Tickets | 9,200.00 | 9,200.00 | 9,200.00 | 9,200.00 | 10,800.00 | 10,800.00 |
| Knott's Tickets | 2,800.00 | 2,800.00 | 2,800.00 | 2,800.00 | 3,200.00 | 3,200.00 |
| Total Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Gross Revenue | 153,150.00 | 152,590.00 | 163,445.00 | 163,445.00 | 170,337.50 | 170,337.50 |
| Cost of Goods Sold | 3,600.00 | 3,600.00 | 3,600.00 | 3,600.00 | 4,200.00 | 4,200.00 |
| T/A Commission | 3,499.13 | 3,386.25 | 3,628.13 | 3,628.13 | 3,749.06 | 3,749.06 |
| Total COGS | 7,099.13 | 6,986.25 | 7,228.13 | 7,228.13 | 7,949.06 | 7,949.06 |
| **Gross Profit** | 146,050.88 | 145,603.75 | 156,216.88 | 156,216.88 | 162,388.44 | 162,388.44 |
| **Expense** | | | | | | |
| **Hotel Direct Expenses** | | | | | | |
| Graphics Social Media | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 |
| Building Repairs & Maintenance | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 |

| | Jan 2022 | Feb 2022 | Mar 2022 | Apr 2022 | May 2022 | Jun 2022 |
|---|---|---|---|---|---|---|
| Dues and Subscriptions | | | | | | |
| Laundry and HK supplies | 4,800.00 | 5,000.00 | 5,000.00 | 5,000.00 | 4,800.00 | 4,800.00 |
| Marketing | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| **Total Hotel Exp** | 8,600.00 | 8,800.00 | 8,800.00 | 8,800.00 | 8,600.00 | 8,600.00 |
| Insurance | | | | | | |
| Building insurance-other | 2,542.72 | 2,542.72 | 2,542.72 | 2,542.72 | 2,542.72 | 2,542.72 |
| Health Insurance | | | | | | |
| Workers' Comp | 1,300.00 | 1,300.00 | 1,300.00 | 1,300.00 | 1,300.00 | 1,300.00 |
| **Total Insurance** | 3,842.72 | 3,842.72 | 3,842.72 | 3,842.72 | 3,842.72 | 3,842.72 |
| Lease Expense | 29,704.58 | 29,704.58 | 29,704.58 | 29,704.58 | 29,704.58 | 29,704.58 |
| Entertainment | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| Meeting Room | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Miscellaneous | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| Room Supplies | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 | 3,200.00 |
| Office Supplies | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 |
| Hotel Payroll Expenses | 39,000.00 | 39,000.00 | 39,000.00 | 39,000.00 | 39,000.00 | 39,000.00 |
| Hotel Payroll Taxes | 5,850.00 | 5,850.00 | 5,850.00 | 5,850.00 | 5,850.00 | 5,850.00 |
| Payroll Service | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 |
| Admin Expenses | | | | | | |
| Other Exp (Prof Contract Instlmnt) | 10,000.00 | 10,000.00 | 10,000.00 | 8,515.50 | | |
| Contract Labor | 3,000.00 | 2,000.00 | 2,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Pool Maintenance | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 |
| Postage and Delivery | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 |
| Professional Fees - IT Support | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| Professional Fees- Accounting | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| Provider fees - CC processing fee F&B | 1850.00 | 1850.00 | 1850.00 | 1850.00 | 1850.00 | 1850.00 |
| Taxes | | | | | | |
| Property Tax | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 |
| **Total Taxes** | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 |
| Utilities | | | | | | |
| Cable | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 | 980.00 |
| Gas and Electric | 10,400.00 | 10,400.00 | 10,400.00 | 10,400.00 | 10,400.00 | 10,400.00 |
| Telephone | 425.00 | 425.00 | 425.00 | 425.00 | 425.00 | 425.00 |
| Water & Sewer | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 |
| Waste Removal | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 |
| **Total Utilities** | 14,605.00 | 14,605.00 | 14,605.00 | 14,605.00 | 14,605.00 | 14,605.00 |
| **Total Expense** | 116,602.30 | 125,602.30 | 125,802.30 | 125,317.80 | 116,602.30 | 116,602.30 |

Capital Reserve (3%)

| | Jan 2022 | Feb 2022 | Mar 2022 | Apr 2022 | May 2022 | Jun 2022 |
|---|---|---|---|---|---|---|
| Net Ordinary Income | 29,448.58 | 20,001.45 | 30,414.58 | 30,899.08 | 45,786.14 | 45,786.14 |
| 3% Royalty Fee | | | | | | |
| Net Income | 29,448.58 | 20,001.45 | 30,414.58 | 30,899.08 | 45,786.14 | 45,786.14 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOE FORSYTHE & HODGES LLP
18101 Von Karman Avenue
Suite 1200
Irvine, CA 92612

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 18101 Von Karman Avenue, Suite 1200, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (*specify*): **RESPONSE OF ROBERT P. GOE, THE SUBCHAPTER V TRUSTEE IN SUPPORT OF HIS MOTION FOR AN ORDER TO SHOW CAUSE WHY BESTHOST INN LLC AND ITS MANAGING MEMBER MICHAEL REAZUDDIN SHOULD NOT BE HELD IN CONTEMPT FOR FAILURE TO OBEY AN ORDER OF THE COURT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On January 13, 2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Michael Jay Berger**    michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Christopher G. Cardinale**    ccardinale@agclawfirm.com, mgonzalez@agclawfirm.com
- **Nicholas W Gebelt**    ngebelt@goodbye2debt.com
- **Robert Paul Goe (TR)**    bktrustee@goeforlaw.com, bkadmin@goeforlaw.com;C187@ecfcbis.com;kmurphy@goeforlaw.com;ggilbert@goeforlaw.com
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **Abel Ortiz**    Abel.ortiz@kts-law.com, danielle.pratali@kts-law.com
- **Corey E Taylor**    corey@taylorlawoc.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Proud Usahacharoenporn**    pusaha@rutan.com, lfenwick@rutan.com

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) January 13, 2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) January 13, 2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- The Honorable Erithe A. Smith, USBC, 411 West Fourth Street, Santa Ana, CA 92701
- (SUSPENDED DUE TO COVID-19 PROTOCOLS)

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 13, 2022 | Kerry A. Murphy | /s/Kerry A. Murphy |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |